# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 5:19CR612 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION AND |
| | ) | ORDER |
| OTIS MCDAY, | ) | |
| | ) | |
| DEFENDANT. | ) | |

Defendant Otis McDay ("McDay") seeks suppression of all evidence seized on September 10, 2019 from a residence located at 814 Kromer Avenue in Akron, Ohio. (Doc. No. 21 ["Mot."].) Plaintiff United States of America (the "government") opposes the motion. (Doc. No. 22 ["Opp'n"].) The Court conducted an evidentiary hearing on February 13, 2020, at the conclusion of which, the Court took the motion under advisement. For the reasons that follow, the motion to suppress is DENIED.

**I. BACKGROUND**

The bizarre facts that unfolded on September 10, 2019 illustrate the challenges inherent in police encounters with private citizens in tense and emotionally charged domestic disputes; encounters that often test the boundaries of the Fourth Amendment.[1] Patrol Officer Jeremy Sosenko ("Sosenko"), a six-year veteran of the City of Akron Police Department and the only witness to testify at the evidentiary hearing, testified that he was dispatched to 814 Kromer

---
[1] The Court notes that the briefing from counsel failed to adequately explore and develop the constitutional issues implicated by the facts surrounding the search, leaving the Court to conduct considerable independent research before preparing the present memorandum opinion. It is not sufficient for counsel to offer legal conclusions, devoid of analysis or supporting case law, and expect the Court to put flesh on the bones.

Avenue in response to a call from Aimee Coleman (hereinafter "A.C."), who indicated that she wanted to pick up her property that was located inside the residence. Sosenko explained that the police department often receives calls from citizens who want to retrieve their personal items. Ordinarily, such requests are easily resolved by contacting the property owner or an existing resident, who is usually amenable to working with law enforcement to arrange for pickup. Sosenko testified that, in this instance, he understood that he was to be standing by on-scene in case a fight started. What Sosenko did not know, however, was that McDay had recently obtained a five-year protection order against A.C. that apparently was in effect before A.C. called. (Doc. No. 21-1 [protection order].)[2]

Much of what transpired during the September 10, 2019 encounter was captured on Sosenko's body camera ("body cam"), and the video recording of the event was played at the hearing. (Gov. Hearing Ex. 1.) Upon arriving on the street in front of 814 Kromer Avenue, Sosenko was met by A.C., who introduced herself saying, "I'm Aimee Coleman, I stay here. Me and my boyfriend [McDay] got into it and I have been trying to find somewhere else to stay. All I want to do is come and get my property." A.C. explained that the house was owned by McDay's father and that McDay, who was currently on monitored parole, was supposed to be residing at another location.[3] She insisted that McDay maintained his residence here, and had recently changed the locks without his father's permission, for the purpose of preventing her from re-acquiring her property. She explained that McDay's father lived nearby and did not care

---

[2] Sosenko testified credibly that he was unaware of the protection order until after McDay was taken into custody and he ran both McDay and A.C. through the LEADS data base maintained by law enforcement. There is also no evidence that the dispatch operator who fielded A.C.'s initial call was aware of the protection order, or that he or she conveyed any information about the existence of the order to Sosenko.

[3] It is undisputed that on September 10, 2019 McDay was wearing an ankle monitor and was serving a term of house arrest.

if A.C. retrieved her belongings and added that the father, like everyone else, was afraid of McDay.

After A.C. expressed skepticism that McDay would voluntarily agree to admit A.C. to the residence, the following exchange took place between A.C. and Sosenko.

> A.C. – "Can I break a window to go into my house? When I called the police department, they told me they didn't want me to, but, if I had to, I could.
>
> Sosenko – "Technically you can. If you live here, you can gain entry by any means."
>
> A.C. – "I got mail and everything that says that I stay here."
>
> Sosenko – "The thing is residency gets hazy in Akron, the way the laws are [written, residency is] such a gray area. I mean if you say that you live here and you can prove that you live here, you know, yeah you can go in there. If there's going to be an argument and question and he can say 'oh no she doesn't live here and I can prove she doesn't live here,' then technically, you've just committed a felony. I don't really know, that's why [the Akron Police Department] generally doesn't get involved in this stuff. We can't really take one side or the other."
>
> \*\*\*
>
> Sosenko – "So we can knock on the door [but] if it's going to turn into a fight . . . I don't want to get into a fight over property."
>
> A.C. – "Well, he's not going to fight you. He's on parole. He's scared to do anything. He's not supposed to be here. Honestly, this isn't even his address."
>
> Sosenko – "Let's trying knocking on the door. I mean, other than that, you are probably going to have to take him to court and sue him civilly over your stuff."
>
> A.C. – So I can't break in even if I wanted to?"
>
> Sosenko – I'm not telling you, you can. I'm not telling you, you can't."

After A.C. unsuccessfully attempted to gain entry by knocking on the front door, Sosenko advised A.C. that he did not believe that it was a good idea for her to force entry by breaking a window. He then inquired further into A.C.'s residency status. A.C. explained that she had lived

3

in the residence with McDay and their daughter for the past two years until the time of the fight approximately two weeks ago. Sosenko then asked whether McDay would contend that A.C. had since moved out, to which A.C. responded, "No. All my stuff is in there. I couldn't have moved out." Sosenko then explained that he was not permitted to supervise a "move-out" but suggested that she call the local sheriff's office to obtain their assistance in recovering her property. A.C. rejected this option—based upon her concern that McDay would remove all of her property from the house in the time it would take to make an appointment to schedule a move-out—and walked to a nearby house purportedly to speak with McDay's father. Upon her return, A.C. represented to Sosenko, "That's the owner, he told me he don't care how I go in there. So I ain't worried about a felony. I'm gonna go through this window, here."

With Sosenko still on the sidewalk in front of the house, A.C. broke the front window. As she entered through the broken window, A.C. could be heard yelling, "I have police at my house." Instantly, a shouting match ensued. From Sosenko's body cam, an obviously startled and agitated McDay could be heard loudly yelling at A.C., who asked Sosenko to tell McDay to open the door. McDay responded by insisting that A.C. did not live there. Sosenko could be heard advising McDay that A.C. maintained that she lived there. In response, McDay yelled, "She don't have no business here." He continued to shout at Sosenko, "You let her break this window?" When Sosenko tried to explain that he did not let A.C. do anything, McDay exclaimed, "I'm pressing charges."

Over the course of the next several minutes, McDay and A.C. continued to argue loudly. On the video, brightly colored bedding can be seen being pushed out through the broken window. McDay protested, insisting that the bedding belonged to their daughter, and that A.C.

4

had no other possessions in the house. Sosenko approached the front door. Despite his improved vantage point from the porch, it was difficult to see into the darkened house, given that it was a sunny day. McDay can be heard continuing to vociferate that A.C. did not live there, that she had no property inside the house, and that she did not have a key. As Sosenko moved closer to the door, the yelling in the house from both McDay and A.C. markedly intensified until the two are heard screaming at each other. A.C. immediately accused McDay of punching her. McDay vehemently denied it and returned his attention to Sosenko. McDay's demeanor had become increasingly agitated. Speaking more quickly, McDay argued that A.C. should not have broken his window. He demanded that Sosenko charge her. When Sosenko tried to explain that A.C. insisted that she lives here, McDay screamed repeatedly, "I'm telling you she doesn't live here," before walking away from view of the door. The yelling inside the house grew fainter as it appeared that the couple moved their fight to another room of the house.

Sosenko repeatedly asked McDay if he wanted to let him in the house. At the hearing, Sosenko testified that, after the allegation of physical violence, he became concerned for A.C.'s safety because the dispute had clearly turned into a fight. Moreover, given the fact that the fight was now moving through the house—in and out of Sosenko's view—Sosenko realized that he would have to enter the house so that he could "get eyes" on the couple to ensure against further violence. He testified that his preference was to gain admittance through the front door so that he could avoid being cut on the broken glass from the window. McDay finally responded to the officer's requests, "I'm not letting you in. She don't belong here . . . I don't have a key," before disappearing after A.C. into another part of the house—out of Sosenko's view.

While Sosenko continued to wait on the front porch, the clamor once again became

5

fainter before A.C. asked Sosenko if he was going to make McDay open the door. Sosenko responded that he was trying to do so. Approximately three minutes after A.C. first accused McDay of striking her, Sosenko entered the house through the broken window. Once inside, Sosenko could see the couple more clearly.[4] McDay continued to loudly argue that A.C. did not belong in the house and that she had no property inside the house, while A.C. can be seen carrying what appears to be a flat screen television. Sosenko waited in the kitchen as McDay followed A.C. throughout the house, in and out of Sosenko's view. Through it all, the couple continued to yell and scream.

McDay also persisted in his belief that neither A.C. nor Sosenko belonged in the house. He asked whether Sosenko had a warrant, and when Sosenko responded that he did not, McDay screamed at the officer that he needed to leave. At this point—approximately 45 seconds after he entered the house—Sosenko can be heard over the din radioing for backup, explaining to dispatch that "this had turned into a 10." At the hearing, Sosenko explained that a "10" was code for a fight.

The next 30 seconds were increasingly chaotic, punctuated by the couple's yells and McDay's loud protests. A.C. and McDay once again disappeared, this time into the basement, and Sosenko followed. McDay continued to yell that none of the property belonged to A.C. as A.C. began rummaging through drawers. Sosenko attempted to determine what property belonged to A.C., but his inquires were simply met with further arguing, yelling, and profanity. When A.C. opened a drawer that contained a large bag of a substance that appeared to be marijuana, Sosenko immediately placed McDay in hand cuffs and escorted him out of the house.

---

[4] From the video, it is clear that McDay is a large man—certainly larger and more muscular than A.C.

In total, less than three minutes separated Sosenko's entry and McDay's arrest.

The rest of the footage from the body cam captured the arrival of other officers and their attempts to secure the scene. Eventually a warrant was obtained for the residence. The subsequent search incident to the warrant yielded a kilogram of cocaine, a hydraulic press, a large sum of money, and other paraphernalia associated with the distribution of narcotics. On October 17, 2019, an indictment issued charging McDay with possession with intent to distribute marijuana and cocaine, being a felon in possession of a firearm and ammunition, and possession of a firearm in furtherance of a drug trafficking offense. (Doc. No. 10 ["Indictment"].)

## II. DISCUSSION

### A. Law on Exigency

"It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 585–86, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980) (The "chief evil" against which the Fourth Amendment protects is the "physical entry of the home[.]") (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 477–78, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971)). This presumption, however, can be overcome by a demonstration that the warrantless search was reasonable. *See Illinois v. Rodriguez*, 497 U.S. 177, 185, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990). For example, "the exigencies of the situation [may] make the need of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 394, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978) (quotation marks and citation omitted); *see Schreiber v. Moe*, 596 F.3d 323, 329 (6th Cir. 2010) ("Exigency exists 'where there are real immediate and serious consequences that would certainly occur were a

police officer to postpone action to get a warrant.'") (quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002)); *Jones v. Lewis*, 874 F.2d 1125, 1130 (6th Cir. 1989) (citing, among authority, *Welsh v. Wisconsin*, 466 U.S. 740, 749–50, 104 S. Ct. 2091, 80 L. Ed. 2d 732 (1984)).

"One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury. 'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.'" *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006) (quoting *Mincey*, 437 U.S. at 392) (further quotation marks and citation omitted). "Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id.* (citing *Mincy, supra*). "This 'emergency aid exception' does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises." *Michigan v. Fisher*, 558 U.S. 45, 47, 130 S. Ct. 546, 175 L. Ed. 2d 410 (2009) (quoting *Brigham City*, 547 U.S. at 404–05). "It requires only 'an objectively reasonable basis for believing,' that a 'person within [the house] is in need of immediate aid.'" *Id.* (quoting *Bringham City, supra*) (further quotation marks and citation omitted)). It is the government that bears the "heavy" burden of demonstrating an urgent need that might justify the warrantless search. *United States v. Mallory*, 765 F.3d 373, 383 (3rd Cir. 2014) (quoting *Welsh*, 466 U.S. at 749–50).

The test, therefore, is an objective one: "'[T]he government must establish that the circumstances as they appeared at the moment of entry would lead a reasonable, experienced law enforcement officer to believe that someone inside the house, apartment, or hotel room required

immediate assistance.'" *United States v. Richardson*, 208 F.3d 626, 629 (7th Cir. 2000) (quoting *United States v. Arch*, 7 F.3d 1300, 1304 (7th Cir. 1993)); *see United States v. Simmons*, 661 F.3d 151, 157 (2d Cir. 2011) (same); *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 548 (6th Cir. 2003) (noting that "we measure exigent circumstances by a standard of objective reasonableness, asking 'whether the facts are such that an objectively reasonable officer confronted with the same circumstances could reasonably believe that exigent circumstances existed'") (quoting *Ewolski*, 287 F.3d at 501); *see also Ohio v. Robinette*, 519 U.S. 33, 39–40, 117 S. Ct. 417, 136 L. Ed. 2d 347 (1996) (eschewing bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry, looking at the totality of the circumstances known to the officer); *see generally In re Sealed Case 96-3167*, 153 F.3d 759, 766 (D.C. Cir. 1998) (noting that the "question of whether there are 'exigent circumstance's is judged according to the totality of the circumstances").

When considering the totality of the circumstances known to the officer, "'[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving.'" *Kentucky v. King*, 563 U.S. 452, 466, 131 S. Ct. 1849, 179 L. Ed. 2d 865 (2011) (quoting *Graham v. Connor*, 490 U.S. 386, 396–97, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)); *see Tierney v. Davidson*, 133 F.3d 189, 196–97 (2d Cir. 1998) (recognizing that an officer may need to make "'a prompt assessment of sometimes ambiguous information concerning potentially serious consequences'") (quoting 3 Wayne LaFave, *Search and Seizure*, § 6.6(a), at 391 (3d ed. 1996)); *United States v. Lawrence*, 236 F. Supp. 2d 953, 964 (D. Neb. 2002) ("Police must often make balanced choices, but domestic violence situations require police to make particularly

delicate and difficult judgments quickly.") The Supreme Court has cautioned that "[i]t does not meet the needs of law enforcement or the demands of public safety to require officers to walk away from a situation [involving a potential exigency]. Only when an apparent threat has become an actual harm can officers rule out innocuous explanations for ominous circumstances." *Fisher*, 558 U.S. at 49.

The government suggests that the Supreme Court specifically endorsed police intervention under circumstances substantially similar to those faced by Sosenko in *Georgia v. Randolph*, 547 U.S. 103, 126 S. Ct. 1515, 164 L. Ed. 2d 208 (2006). There, the Court held that an evidentiary seizure based on the permission of one occupant is unlawful as against a co-occupant who is present at the residence and expressly refuses to consent. *Id*. at 106. In response to the dissent's concerns that such a ruling leaves vulnerable an abused occupant whose violent partner refused the police entry, the Court observed, in dicta:

> No question has been raised, or reasonably could be, about the authority of the police to enter a dwelling to protect a resident from domestic violence; so long as they have good reason to believe such a threat exists, it would be silly to suggest that the police would commit a tort by entering, say, to give a complaining tenant the opportunity to collect belongings and get out safely, or to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur, however much a spouse or other co-tenant objected. (And since the police would then be lawfully in the premises, there is no question that they could seize any evidence in plain view or take further action supported by any consequent probable cause. . . . ).

*Id*. at 118. The government's citation to *Randolph* proves too much as it is clear from the Supreme Court's language that its hypothetical scenario *assumes* that the police have "*good reason to believe such a threat exists[.]*" *Id*. (emphasis added). The Court must, therefore, determine, based on the totality of the circumstances, whether Sosenko had good reason to believe that A.C. was in imminent risk of serious harm.

B.    The Existence of an Exigency

McDay insists that the facts known to Sosenko did not give rise to a reasonable belief that A.C. had been injured or was in imminent risk of serious injury. At best, he believes that any reasonable officer could conclude only that that the couple was engaged in a simple argument that was unlikely to turn violent. Yet, "[d]omestic disputes present a very real danger of physical injury. The Supreme Court, relying on many scientific studies, has recognized the pervasive and violent nature of domestic disputes." *Lawrence*, 236 F. Supp. 2d at 961 (citing *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 891, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992) (citing further authority)). Because "'[c]ourts have recognized the combustible nature of domestic disputes, [they] have accorded great latitude to an officer's belief that warrantless entry was justified by exigent circumstances when the officer had substantial reason to believe that one of the parties to the dispute was in danger.'" *United States v. Brooks*, 367 F.3d 1128, 1136 (9th Cir. 2004) (quoting *Tierney*, 133 F.3d at 197); *see Fletcher v. Clinton*, 196 F.3d 41, 50 (1st Cir. 1999) (noting that in domestic disputes, "violence may be lurking and explode with little warning"); *but see United States v. Davis*, 290 F.3d 1239, 1244 (10th Cir. 2002) (refusing to recognize a *per se* exigent need in all domestic abuse cases, and requiring additional facts beyond a report of a domestic dispute to justify a warrantless entry).

Here, the circumstances known to Sosenko went well beyond the existence of an argument. From the moment A.C. forced her way into the house, the atmosphere was hostile, explosive, and volatile. McDay was enraged that the police had stood by while A.C. forcibly

gained entry into his residence and his agitation and anger grew as the encounter continued.[5] The decibel level of the screaming also continued to climb. Given that McDay had taken the extraordinary measures of changing the locks—and, unbeknownst to Sosenko, obtaining a protection order against A.C.—his reaction was understandable.[6] Nonetheless, these were the facts (including A.C's allegation of physical violence) known to Sosenko, and they would have led a reasonable officer to believe that A.C. had already been injured or was in imminent risk of injury and that immediate entry was necessary to prevent further harm.

However, McDay complains that Sosenko did not see the alleged punch thrown, and, in fact, never witnessed any physical violence directed toward A.C. He also underscores that Sosenko did not inquire about A.C.'s injuries until after McDay was in custody. "Officers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." *Fisher*, 558 U.S. at 48 (citing *Brigham City, supra*); *see Schreiber*, 596 F.3d at 331 (Evidence of blood, broken objects, or gunfire, "are not prerequisites to a finding of exigency.") "[I]t sufficed to invoke the emergency aid exception that it was reasonable to believe that . . . [McDay] was about to hurt, or had already hurt [A.C.]."[7] *Id*. (citing *Fisher*, 558 U.S. at 49); *see*

---

[5] In fact, this situation was unlike the typical police encounter where officers are dispatched to investigate a report of a domestic dispute and find two individuals, inside a residence they share, engaged in an argument already in progress. Here, the officer knew that both participants challenged the other person's right to even be in the house, and the officer personally witnessed A.C.'s bold efforts to enter and heard, in real time, McDay's agitation.

[6] Interestingly, in all his protests to Sosenko about A.C.'s conduct, McDay never mentioned or otherwise informed Sosenko that he had obtained a protective order against A.C.

[7] Likewise, the fact that Sosenko waited to check on A.C.'s condition until after the fight was over has no bearing on whether Sosenko reasonably believed that A.C. was in imminent danger of future injury. Moreover, even if such a delay was evidence of Sosenko's subjective belief that A.C. was not in real danger, "the test, as [the Supreme Court] has said, is not what [the officer] believed, but whether there was 'an objectively reasonable basis for believing' that medical assistance was needed, or persons were in danger." *Fisher,* 558 U.S. at 49 (quoting, among authority, *Brigham City*, 547 U.S. at 406) (rejecting argument that officers could not have been motivated by a perceived need to provide medical assistance since they never summoned emergency medical personnel).

*also United States v. Brown*, 64 F.3d 1083, 1086 (7th Cir. 1995) ("We do not think that the police must stand outside an apartment, despite legitimate concerns about the welfare of the occupant, unless they can hear screams"); *see, e.g., Tierney*, 133 F.3d at 193 (risk of imminent harm justified warrantless entry, despite the fact that "[t]here was no overturned furniture, no blood, no dangerous weapon, no hysterical victim, no noise"); *Neal v. Pauley*, No. 1:12CV343, 2014 WL 2452983, at *5–6 (N.D. Ind. June 2, 2014) (even without evidence of injuries or fighting, given "the nature of the [911] call, the screaming and yelling of adults and the hysterical crying of the children, the defendant officers had a reasonable belief that immediate entry into the residence was justified"); *Lawrence*, 236 F. Supp. 2d at 961 (even though officers did not see any evidence of physical injury, they had a right to enter the premises of a domestic dispute because "they did not know if [the wife] had been harmed or if the defendant, in his agitated and enraged state, was about to harm her").

Equally unavailing is McDay's argument that an exigency obviously did not exist because Sosenko waited three minutes from the time A.C. accused McDay of striking her until he entered through the broken window. At the hearing, counsel for McDay insisted that officers do not have "the luxury of evaluating a situation when there's an emergency." He suggested that officers must "seize the moment" and rush in if a true emergency exists. The Court is aware of no law that requires such a rash response from law enforcement. Moreover, the passage of a few minutes while Sosenko considered other options, such as gaining access through the front door to avoid potential injury from the broken glass, did not render the situation any less dangerous. *See Bing ex rel. Bing v. City of Whitehall*, 456 F.3d 555, 565–66 (6th Cir. 2006) (officers' decision to wait for backup, gather perimeter reports, and devise an entrance strategy before entering the

premises did not negate the exigency).

Ultimately, the Court finds that the totality of the facts known to Sosenko are sufficient for a reasonable officer to determine that it was necessary to make a warrantless entry into the home to render aid to A.C. and/or protect her from potential serious harm.[8] The initial entry was justified by exigent circumstances.

### C. The Exigency did not Abate

McDay also argues that, even if there was initially an exigency that justified Sosenko's entry into the home, the exigency had abated long before Sosenko discovered the illegal drugs. "Exigent circumstances terminate when the factors creating the exigency are negated." *Bing*, 456 F.3d at 565 (citations omitted); *see, e.g. Corrigan v. Dist. of Columbia*, 841 F.3d 1022, 1031 (D.C. Cir. 2016) (any possible exigency had been abated once defendant was in custody and a protective sweep revealed that no other individuals were present); *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994) ("We conclude no exigent circumstances existed to justify the warrantless seizure of the guns. Once the police had freed [the hostage], the police had ample time to secure the premises and to obtain a search warrant."). "'[O]nce the exigencies of the initial entry have dissipated, the police must obtain a warrant for any further search of the premises.'" *Mallory*, 765 F.3d at 384 (quoting *United States v. Murphy*, 516 F.3d 1117, 1121

---

[8] That said, it would also have been possible for a reasonable officer to evaluate the same facts and determine that A.C. had not suffered injury and was not likely to, especially if one considers A.C.'s conduct after McDay was arrested. For example, as Sosenko led a handcuffed McDay up the stairs, A.C. followed taunting him, "That's what you get, that's what you get." At this point, the reasonable officer might have concluded that A.C. lied about the punch to draw the officer into the house. It is inappropriate, however, to "replace [the] objective inquiry into appearances with [a] hindsight determination that there was in fact no emergency." *Fisher*, 558 U.S. at 49; *see also United States v. Rohrig*, 98 F.3d 1506, 1524 (6th Cir. 1996) (rejecting argument that the officers could have taken other measures short of entering his home to abate the noise violation, such as calling or activating their squad car lights or siren, as "pure speculation" that is inappropriately considered in the reasonableness analysis). Moreover, such an approach is especially inappropriate in these types of situations where officers are required to make split-second decisions, including credibility calls, in rapidly evolving situations. *See Graham*, 490 U.S. at 396–97.

(9th Cir. 2008) (further citation omitted)).

As is evident from the video, the exigency did not terminate due to the passage of time or as a result of Sosenko's attempts to manage the chaos. If anything, Sosenko's continued presence only seemed to energize and fuel the fight as McDay became increasingly agitated and A.C., in turn, became increasingly invested in the fight. *See Bing*, 456 F.3d at 565 (The "exigency did not terminate due to the passage of time because [defendant] was at all times dangerous."); *e.g., Schreiber*, 596 F.3d at 331 (exigency had not abated, even after officer confirmed that plaintiff's daughter was unharmed, because the "chaotic" situation in the home continued to "deteriorate" and there was a "considerable amount of shouting"); *United States v. Scott*, 876 F.3d 1140, 1144 (8th Cir. 2017) (In a "highly fluid and evolving" domestic dispute, a reasonable officer would have been justified in finding that the exigency did not abate when officers entered the garage for the purpose of determining that everyone was safe.). Based upon a consideration of the totality of the circumstances, the Court must conclude that a reasonable officer would believe that—in the three minutes between Sosenko's warrantless entry and McDay's arrest—the exigency had not abated.

To be sure, Sosenko's hearing testimony on cross-examination gives the Court some pause. In response to the question "So you are keeping the peace. This is not an emergency situation where you, you know, need to – I mean, you are just keeping the peace at that moment; is that correct[,]" Sosenko responded, "Correct. I am trying to diffuse the situation because it was kind of a chaotic, loud screaming situation." Yet, the Supreme Court has observed that "'[t]he role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties.'" *Fisher*, 558 U.S. at 49 (quoting *Brigham City*, 547 U.S. at 406)

15

(alteration in original). "[A]n officer is not like a boxing (or hockey) referee, poised to stop a bout only if it becomes too one-sided." *Bringham, City*, 547 U.S. at 406. Sosenko testified credibly on direct and re-direct (and even during cross-examination) that the dispute had turned into a fight, and that he knew that he needed to try to diffuse the situation so that there was no further violence. Given the fluid, ever evolving nature of the situation, the Court finds that the exigency had not abated at any point before McDay was arrested. *See, e.g., Scott*, 876 F.3d at 1144.

>    D.    **The Exigency was not Created by the Police**

Alternatively, defense counsel argued at the hearing that if there was an exigency, Sosenko actually contributed to it by failing to take certain measures to avoid or short-circuit the fight.[9] He argued that the police "cannot be complicit in creating exigent circumstances and then benefit from them by ultimately seeing the treasure that's found in the drawer." Counsel insisted that the police department is "responsible for this, as [A.C.] herself is. If [Sosenko] didn't allow her to break the window, this doesn't happen."

In *King*, the Supreme Court discussed the parameters of the "so-called 'police-created exigency' doctrine." *King*, 563 U.S. at 461. "Under this doctrine, police may not rely on the need to [make a warrantless entry into the premises] when that exigency was 'created' or 'manufactured' by the conduct of the police." *Id.* (collecting cases). However, "[w]here, as here, the police did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment, warrantless entry [to address an exigency] is reasonable and

---

[9] Counsel suggested that Sosenko should have checked to see if there was a protection order against A.C. and should have required A.C. to provide proof of residence before she broke a window and gained entry. Of course, McDay confirmed that A.C. had some tie to the house when he identified the brightly colored bedding as belonging to the couple's daughter and pointed out certain items in the basement as belonging to A.C.

thus allowed." *Id*. at 462. The exigency here was created by A.C.'s decision to force entry to the house and recover her belongings, not by any unlawful conduct by Sosenko. *See Schultz v. Buchanan*, 829 F.3d 943, 949 (8th Cir. 2016) (officer did not create the exigency by asking defendant's wife to go into the home to ask defendant to come out to speak with officers); *United States v. Paulino*, 495 F. App'x 799, 802 (9th Cir. 2012) (citing *King*, and finding that "the exigency was created by the triggering of the breach-detection device and the concomitant danger of evidence destruction, not the officers' allegedly false announcement that they had a valid search warrant").

Moreover, there is nothing about the encounter at 814 Kromer Avenue that would lead to the conclusion that Sosenko was looking for a way to enter the home to search for evidence. Sosenko did not prompt A.C. to break the window, and, in fact, he counseled against it and even tried to encourage A.C. to consider less drastic means of recovering her property. He made it clear to A.C. that he could not participate in a "move-out" and told her that he did not want to get into a fight over property. He also delayed going into the home, electing to wait on the curb and porch. Once inside, he remained in the kitchen and did not venture further into the home until A.C. and McDay disappeared to the basement, arguing, and out of his view. Because the resulting volatile situation was not created or manufactured by Sosenko, the government is entitled to rely on the emergency aid exception to justify the warrantless entry.

From the safety of the courtroom, and with the benefit of hindsight, it is tempting to second guess the decisions made by the officer as the tumult unfolded. It could certainly be argued that Sosenko should have been more authoritative in his discouragement of A.C.'s plan to force entry into the house. Further, once inside there may have been opportunities to separate the

couple, remove A.C. from the house entirely, or otherwise take the intensity of the situation down a few notches.[10] While he testified repeatedly that it was his goal to diffuse the situation, it does not appear that Sosenko took any affirmative steps that were likely to de-escalate the situation.[11] In fact, Sosenko candidly admitted that he could have handled the situation better, and that there came a point in time when he was simply stalling until his backup arrived. But in this explosive situation, the Court will not allow hindsight to control consideration of the on-the-spot determinations by an officer in a rapidly evolving encounter. *See Fisher*, 558 U.S. at 49 (criticizing the Michigan court of appeals for substituting the officer's evaluation of the facts with a hindsight determination that no emergency existed); *King*, 563 U.S. at 466 (quoting *Graham*, 490 U.S. at 396–97); *Rohrig*, 98 F.3d at 1524 (refusing to engage in "pure speculation" that other approaches might have obviated the need for a warrantless police entry).

Ultimately, the Court finds that exigent circumstances justified Sosenko's initial entry into the house, and that the exigency did not abate at any time before McDay was placed in custody. Because Sosenko was lawfully in the house to render aid and/or protect A.C. from imminent harm, his discovery of the drugs in plain view and the resulting arrest did not violate the Fourth Amendment. *See King*, 563 U.S. at 462–63; *Thompson v. Louisiana*, 469 U.S. 17, 22, 105 S. Ct. 409, 83 L. Ed. 2d 246 (1984) (per curiam) (noting that plain-view seizure would have

---

[10] While admitting that he could have removed A.C., Sosenko testified that he would have had to forcibly remove her.

[11] Of course, given the fact that McDay appeared as upset at the officer for "allowing" A.C. to break his window and force entry as he was at A.C. for engaging in the underlying conduct, the Court questions whether *any* action on the part of the officer would have diffused the situation.

been valid if officers had found the evidence while they were on the premises to offer medical assistance); *see also Randolph*, 547 U.S. at 118; *see, e.g., Lawrence*, 236 F. Supp. 2d at 965 ("The weapons were in plain view from [the officer's vantage point], and once it was learned that the defendant had previously been arrested on a felony drug charge, their incriminating character was obvious.").

### III. CONCLUSION

For all the foregoing reasons, McDay's motion to suppress is DENIED.

**IT IS SO ORDERED**.

Dated: March 5, 2020

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**